UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>Jannery A. Lara</u>,
     Plaintiff

     v.                            Civil No. 08-cv-362-SM
                                       Opinion No. 2010 DNH 042
<u>New Hampshire Department</u>
<u>of Health and Human Services</u>,
     Defendant

## O R D E R

Pro se plaintiff Jannery Lara, a former employee of the New Hampshire Department of Health and Human Services, has sued the Department for racial discrimination in violation of Title VII of the Civil Rights Act of 1964. Before the court are the parties' cross motions for summary judgment. Defendant objects to plaintiff's motion. For the reasons given, the Department's summary judgment motion is granted, and Lara's motion is denied.

### Summary Judgment Standard

A summary judgment motion should be granted when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.' " <u>Dávila v. Corporación de P.R. para la Diffusión Pública</u>, 498 F.3d 9, 12

(1st Cir. 2007) (quoting <u>Acosta v. Ames Dep't Stores, Inc.</u>, 386
F.3d 5, 7 (1st Cir. 2004)).   "Once the moving party avers an
absence of evidence to support the non-moving party's case, the
non-moving party must offer 'definite, competent evidence to
rebut the motion,' " <u>Meuser v. Fed. Express Corp.</u>, 564 F.3d 507,
515 (1st Cir. 2009) (citing <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d
816, 822 (1st Cir. 1991)), and "cannot rest on 'conclusory
allegations, improbable inferences, [or] unsupported
speculation,' " <u>Meuser</u>, 564 F.3d at 515 (quoting <u>Welch v. Ciampa</u>,
542 F.3d 927, 935 (1st Cir. 2008)).   When ruling on a party's
motion for summary judgment, a trial court "constru[es] the
record in the light most favorable to the nonmovant and
resolv[es] all reasonable inferences in [that] party's favor."
<u>Meuser</u>, 564 F.3d at 515 (citing <u>Rochester Ford Sales, Inc. v.
Ford Motor Co.</u>, 287 F.3d 32, 38 (1st Cir. 2002)).

## Background

Jannery Lara is of Dominican descent.   English is her second
language.   She speaks English with an accent that she concedes
can be difficult to understand.   As she says in her summary
judgment motion:

> I suggested she [Vanessa Tancrede] [speak] to me [on] a
> daily basis so that she can understand my accent just
> like Frank Nugent . . . and many other staff members
> from other divisions . . . and other secretaries have

done.  I told her that the more we can communicate the
more she would understand my accent.

(Pl.'s Mot. Summ. J. (document no. 16), at 6.)


In December of 2004, Lara was hired by the Department of
Health and Human Services ("HHS" or "Department") to fill the
position of Secretary II in the Manchester Juvenile Probation and
Parole Office.  From the outset, her goal was to "step[ ] up the
ladder within the agency."  (Pl.'s Mot. Summ. J., at 1.)  When
hired Lara held a bachelor of arts degree with a major in
economics and a minor in French.  About two years after she began
working at HHS, she earned a master's degree in Human Services
and Community Counseling Psychology.  She earned that degree to
enhance her prospects for advancement within the Department.
During her nearly four years of employment with the Department,
Lara applied for twenty-one other HHS positions.[1]  She was not
successful in obtaining any of those positions.


Lara worked as one of three secretaries assigned to the
Manchester Juvenile Probation and Parole Office.  Stacy Colby

---

[1] She applied for two Family Service Specialist II
positions, two Employment Counselor Specialist positions, eleven
Child Protective Service Worker I positions, one Child Support
Officer position, two Juvenile Probation and Parole Officer
positions, two Youth Counselor II positions, and one Youth
Counselor I position.  (Def.'s Mot. Summ. J. (document no. 14),
Ex. A (Doe Aff.), Attach. 3.)

held the title of Executive Secretary.  Lara and Colby had a
difficult working relationship.  Lara's 2005 performance
evaluation listed three areas for improvement, including:
"Communicating with the JPPO assigned Executive Secretary with
regards to accepting tasks, requesting clarification when there
is not a clear directive." (Def.'s Mot. Summ. J., Ex. E
(Tewksbury Aff.), Attach. 1, at 4.)  Similar notations were made
on her evaluations for 2006 and 2007.  (See id., Attachs. 2 & 3.)
On October 23, 2006, Lynne Tewksbury, the Department's District
Office Manager of Operations for Manchester, met with Lara and
Colby, in an effort to resolve difficulties they had in working
together.  (Id., Attach. 4, at 4.)

In September of 2006, the Manchester Juvenile Probation and
Parole Officers ("JPPOs") and their clerical staff moved from 195
McGregor Street to the Stark House, on the campus of the Youth
Development Center.  (Def.'s Mot. Summ. J., Ex. E ¶ 8.)
According to Tewksbury:

> Although Jannery [Lara] and Stacy had complained about
> each other while they were directly under my
> supervision at McGregor Street, their conflict seemed
> to escalate after the move to the Stark House as there
> was no one from outside to watch [t]hem or to mediate.
> Sandra Ziegler the JPPO Field Supervisor and my
> Supervisor, Penny Caldwell, asked me to bring both
> women back to work at McGregor Street under my direct
> supervision.  Stacy and Jannery were reassigned by me
> to McGregor Street at the same time.  Both were treated
> the same way.

. . . .

Following the reassignment I also had a meeting on April 10, 2007 with Stacy and Jannery both present at the same time, as well as Frank Nugent and my supervisor, Penny Caldwell.  Both women were told exactly the same thing about the need to get along with each other, to work cooperatively, to stop the constant negative comments and inappropriate raised voices. Both were given as a written follow-up exactly the same memo of counseling.

(Id. ¶¶ 8-10.)

Regarding the nature of the conflict between Lara and Colby, Tewksbury "never observed or heard any comments or actions by Stacy about Jannery related to Jannery's ethnic background or accent" and "Jannery never reported to [Tewksbury] that anyone, including Stacy treated her badly or differently because of her ethnic background or accent." (Id. ¶ 6.)  Manchester JPPO Supervisor Frank Nugent says: "I never heard Ms. Colby or anyone else in the Manchester JPPO office make any reference of a racial or ethnic nature to or about Ms. Lara.  Ms. Lara never told me that anyone had said or done anything to her related to her race or ethnic background." (Def.'s Mot. Summ. J., Ex. D (Nugent Aff.) ¶ 6.)

Finally, at least according to Lara, she also had strained relations with three JPPOs, Rhonda Henault, Vanessa Tancrede, and Christen McCarthy.  In Lara's view, the three JPPOs did not want

5

to deal with her, and generally aligned themselves with Colby and against her.

As a result of her dissatisfaction with the way she was treated while employed by the Department, Lara filed suit in this court.  In an order dated February 6, 2009, the magistrate judge construed Lara's <u>pro se</u> complaint as raising the following claims of racial discrimination:

> [E]mployees of the defendant agency discriminated against [Lara] because she is Hispanic, by creating a hostile work environment, failing to timely address and resolve the hostile work environment on a management level, denying her promotions or desirable positions within the agency, and taking adverse actions in her work environment in order to deprive her of contact with other staff members.

(Order (document no. 3), at 8.)  Based upon the magistrate judge's order, the court construes Lara's complaint as claiming that, because she is Hispanic, the Department refused to promote or to hire her for the various positions she sought, subjected her to disparate treatment by transferring her from the Stark House back to McGregor Street, and subjected her to a hostile work environment.

## Discussion

Both parties have moved for summary judgment.  In its motion, HHS addresses the claims identified by the magistrate

judge.  In her cross-motion for summary judgment, Lara addresses
the claims that were identified by the magistrate judge and, in
addition, she appears to introduce various additional theories,
such as failure to provide job training, failure to promote,[2]
retaliation, and failure to provide references.  Absent a motion
to amend the complaint, which has not been filed, those new
theories or claims are not part of this case.  Finally, the
Department points out, correctly, that Lara's motion does not
comply with Local Rule 7.2(b), because it does not "incorporate a
short and concise statement of material facts, supported by
appropriate record citations," and that Lara has failed to
authenticate the various documents she has appended to her
motion, because she has not submitted an affidavit in support of
her motion.  In addition, because Lara's motion is not subscribed
under penalty of perjury, in accordance with 28 U.S.C. § 1746,

---

[2] Lara's failure-to-promote claim illustrates the heart of
this case:

> I went to college to get more training hoping that
> as soon as I was done I was going to be placed at a
> higher position.  I was a secretary II before I went to
> college.  After I got my master in Science I was forced
> to remain in that position for no one would hire me for
> the lack of experience!  In addition to that once I was
> done with my studies, no one from the human resources
> contacted me, which I strongly believe that calling
> employees after they obtain a higher degree, clearly
> pertained to the agency in order for them to offer me a
> better position, for I went back to school specifically
> to be promoted within the agency.

(Pl.'s Mot. Summ. J., at 9.)

7

none of the factual allegations stated therein are properly
before the court. <u>See</u> <u>Meuser</u>, 564 F.3d at 515; <u>Serapion v.</u>
<u>Martinez</u>, 119 F.3d 982, 987 (1st Cir. 1997) ("the court may
ignore unsupported conclusions, rank speculation, and opprobrious
epithets").  In sum, Lara has produced no evidence properly
cognizable at summary judgment, either in support of her motion
or in opposition to the Department's motion, other than the
Department's responses to ten requests for admissions (<u>see</u> Def.'s
Mot. Summ. J., Exs. 29, 37).


    Title VII of the Civil Rights Act of 1964 makes it unlawful
for an employer "to fail or refuse to hire . . . or otherwise to
discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, . . . or national
origin."  42 U.S.C. § 2000e-2(a)(1).  As noted above, this case
consists of claims that the Department discriminated against Lara
because of her race by: (1) refusing to hire her for the
positions she applied for; (2) subjecting her to disparate
treatment by transferring her from the Stark House to McGregor
Street; and (3) subjecting her to a hostile work environment.
All three claims are analyzed under the familiar <u>McDonnell</u>
<u>Douglas</u> framework, under which the plaintiff must establish a
prima facie case of discrimination, the defendant must respond by

articulating a legitimate non-discriminatory reason for its employment action, and, if defendant does so, then, "the plaintiff must . . . show that the defendant's articulated reason is pretextual and that the defendant's action was in fact motivated by prohibited discrimination."  Garcia v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 n.2 (1st Cir. 2008) (citing Douglas v. J.C. Penney Co., 474 F.3d 10, 14 (1st Cir. 2007); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33-34 (1st Cir. 2001)).

A. Failure to Hire

Lara claims that the Department discriminated against her, because of her Hispanic heritage, by refusing to hire her for any of the positions she sought within the Department.  The Department moves for summary judgment on grounds that Lara was either unqualified for the positions she sought, or was rejected in favor of candidates with superior qualifications.

An employer's failure to hire a job applicant because of his or her race is a discriminatory act expressly forbidden by 42 U.S.C. § 2000e-2(a)(1).  To establish a prima facie case, Lara must show that "1) [s]he is a member of a protected class, 2) [s]he is qualified for the job, 3) the employer took an adverse employment action against h[er], and 4) the position remained open, or was filled by a person with similar qualifications."

Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff, 511
F.3d 216, 221 (1st Cir. 2007) (citing Kosereis v. Rhode Island,
331 F.3d 207, 12-13 (1st Cir. 2003)).

Lara's complaint alleges, in a vague way, that the
Department rejected her for various positions because of her lack
of education (Compl. ¶ 6) and that, after she completed her
master's degree, she was rejected for other positions due to her
lack of experience (id. ¶ 7).  The only position she specifically
mentions is a JPPO position, which she claims she did not get
"for the sole reason of not having experience even though [she]
knew about the work that is being done in that office."  (Id. ¶
12.)
She also makes the following allegation:

> The Department of Health and Human Services is
> plagued with people who discriminate against Hispanics
> like me, specially those supervisors who are
> interviewing candidates and discriminate against
> Hispanics, such as Jennifer Ross.  When I went to her
> for a first interview, she looked at me from head to
> toes with a disgusting look.[3]

(Compl., at 3.)  Lara's motion for summary judgment is not much
more specific than her complaint.  She says she "applied to about
25 jobs" (Pl.'s Mot. Summ. J., at 2), but specifically identifies

---

[3] Neither Lara's complaint nor her summary judgment motion
identifies the position she was applying for when Ross allegedly
gave her "a disgusting look."

only four positions for which she applied and was rejected: two

Child Protective Service Worker I positions (numbers 42074 and

42090) and two Youth Counselor I positions (numbers 11655 and

30201).[4]   Lara has not established a prima facie case with regard

to any of those four positions.


As noted above, Lara has produced virtually no evidence at

all.  Her summary judgment motion contains numerous factual

allegations but is unsworn; her motion is supported by no

affidavits; and only two of her exhibits – two pages of responses

to requests for admissions she propounded on the Department – are

properly part of the summary judgment record.  Thus, Lara has

produced no evidence to establish that she was qualified for any

of the four positions at issue or that she had qualifications

that met or exceeded those of any of the applicants who were

selected.


Beyond that, when asked in an interrogatory, to "[d]escribe

in full and complete detail all facts on which you base your

allegation that you were the most qualified applicant for each of

---

[4] Lara also complains about the Department's offering
positions to J.H., Jennifer Day, and Joshua Henault (Pl.'s Mot.
Summ. J., at 7), but it does not appear that Lara applied for any
of the positions those three were offered (Doe Aff., Attach. 3).
Obviously, Lara's (unsupported) allegations about J.H., Day, and
Henault are not tied to her failure-to-hire claim.

the positions you applied for," (Def.'s Mot. Summ. J., Ex. H, at
2), Lara replied:

> I do not believe I said I was the most qualified
> applicant for each of the positions I applied for.  If
> anything near that, I said that the agency needed a
> Spanish speaking employee and that I possess bilingual
> skills and that those skills would bring to the agency
> a needed asset for the DHHS has lots of Spanish
> speaking families and children who cannot speak
> English.

(Id.)  Based on the foregoing, Lara appears to concede failure to
meet the fourth element of her claim by acknowledging that the
four positions at issue were filled by more qualified
applicants.[5]  If those positions were filled by more qualified
applicants then, necessarily, Lara was not denied those positions
because of her race.


Lara has produced no evidence to establish either the second
or fourth elements of her failure-to-hire claim.  Thus, she has
failed to carry her burden, light though it may be, see Mariani-
Colon, 511 F.3d at 221-22 (citation omitted), to state a prima

---

[5] Lara also concedes, albeit somewhat generally, that she
was not well qualified for some of the positions she applied for:

> When I got to my application, after applying for 4
> positions within the Manchester Division for Children,
> Youth and Families my scores were the lowest and the
> competencies to be rated, I was rated at the lowest (1)
> 98% of the time.

(Def.'s Mot. Summ. J., at 10.)

facie case of discriminatory failure to hire.  Accordingly, the
Department is entitled to judgment as a matter of law on Lara's
failure-to-hire claim.

Moreover, based upon the evidence produced by the
Department, it seems plain that even if Lara had attempted to
produce relevant evidence, she would not have been able to
establish a prima facie case.  To dispel any sense that the
Department has prevailed on a mere technicality, the court will
review, briefly, the relevant evidence produced by the
Department.

The Child Protective Service Worker I ("CPSW I") position in
Manchester (number 42074) was filled by M.R., who scored 77.33 on
the interview (Doe Aff., Attach. 10-S, at 5), completed a one-
year internship with the Division of Children, Youth and Families
(Def.'s Mot. Summ. J., Ex. C (Ross Aff. I) ¶ 11 ), and had
previous experience working with children (Doe Aff., Attach. 10-
S, at 3).  Lara, by contrast, had a score of approximately 62 on
the interview (Ross. Aff. I ¶ 9) and had no relevant experience
working with families (id., Attach. 2, at 1).  Based on her
interview score, Lara was not qualified for the position in the

first instance[6] and, beyond that, lost out to a more qualified candidate.

The CPSW I position in Nashua (number 42090) was filled by P.P., who scored 89.33 on the structured interview (Doe Aff., Attach. 10-N, at 6), and who had already worked for the Department as a CPSW for more than five years (<u>id.</u> at 1).  Lara's actual interview score is not a part of the summary judgment record, but the Department has produced evidence that she interviewed poorly.[7]  In any event, by virtue of his or her five years as a CPSW, P.P. was unarguably more qualified for the CPSW I position than was Lara.

_____

[6] The job description for the CPSW I position provides, as a special requirement, that "[f]or appointment consideration, Child Protective Service Worker I applicants must successfully participate in a structured interview measuring possession of knowledge, skills and abilities identified as necessary for satisfactory job performance by this class specification." (Doe Aff., Attach. 6, at 2.)  Regarding what qualifies as successful participation in the structured interview, "the Director of Personnel has determined that a passing score of at least 70 must be obtained from any candidate in order to be considered." (Doe Aff. ¶ 10.)

[7] Specifically, the Department has produced a set of Child and Protective Serviceworker Rating Sheets compiled as a part of the application process for the CPSW I position in Nashua. Lara's final score is not entirely clear, but of the sixty-six individual ratings she received from three reviewers, on a scale of one (low) to five (high), forty-nine were ones, fourteen were twos, and three were threes.  (Def.'s Mot. Summ. J., Ex. F (Ross Aff. II), Attach. 1.)

The successful candidates for the two Youth Counselor II positions also had superior qualifications. Lara lost out on position number 11655 to G.F., who was employed as a Youth Counselor I at the time of his or her application. (See Doe Aff., Attach. 10-Q, at 3). Lara points out that G.F. had only an eleventh-grade education, in contrast to her master's degree, but still, in view of G.F.'s previous employment as a Youth Counselor I, it cannot be said that Lara was as or better qualified based upon her degree alone. Likewise, Lara was passed over for position number 30201 in favor of D.W., who, like G.F., who was working for the Department as a Youth Counselor I at the time he or she applied for the Youth Counselor II position. (See Doe Aff., Attach. 10-P, at 1.) Again, notwithstanding Lara's master's degree (as compared with D.W.'s high school diploma), it cannot be said that Lara was as or better qualified than the successful applicant for position number 30201.

B. Disparate Treatment

Lara's disparate-treatment claim has its origins in the following factual allegation:

> Management retaliated against me after so many unsuccessful attempts to step up the ladder, that, I was transfer[red] to another office where my daily workload was sent to me via my supervisor and picked up by another staff member or anyway possible for management to avoid having me working with the rest of the staff.

15

(Compl. ¶ 13.)  The magistrate judge construed that allegation as a claim that the Department took "adverse actions in [Lara's] work environment in order to deprive her of contact with other staff members." (Order, at 8.)  That is, the magistrate appears to have understood Lara to be making a disparate-treatment claim based upon her transfer.[8]

"Disparate treatment is the most easily understood type of discrimination.  The employer simply treats some people less favorably than others because of their race, color, religion, sex, or other protected characteristic." Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)) (internal quotation marks, brackets, and ellipsis omitted). "Liability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision.' " Raytheon, 540 U.S. at 52 (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)).

---

[8] In her summary judgment motion, Lara discusses her transfer in the context of a retaliation claim.  While Lara uses the word "retaliation" in paragraph 13 of her complaint, she does not say with any precision what action the Department was allegedly retaliating for and, in any event, she identifies nothing that would qualify as protected conduct under Title VII. Thus, as noted above, there is no viable retaliation claim in this case.

Lara's disparate-treatment claim fails because she has produced no evidence that she was treated any differently than any similarly situated non-Hispanic HHS employee.  It is undisputed that when Lara and Colby had difficulty working together at the Stark House, their supervisor transferred <u>both</u> of them back to McGregor Street, at the same time, to work under her direct supervision.  In short, there is no support in the summary judgment record for Lara's disparate-treatment claim. Accordingly, the Department is entitled to judgment as a matter of law.

C. <u>Hostile Work Environment</u>

Lara claims that she was subjected to a hostile work environment because of her Hispanic heritage.  The Department moves for summary judgment on grounds that the offensive conduct Lara identifies was neither race-based nor sufficiently severe to constitute objectively offensive harassment.  The Department is correct.

"A hostile work environment exists in violation of Title VII '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' "  <u>Kosereis</u>, 331 F.3d at

17

216 (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)).

> To make out a prima facie case of hostile work environment, a plaintiff must show that (1) he is a member of a protected class; (2) he experienced uninvited harassment; (3) the harassment was racially-based; (4) the harassment was so severe or pervasive as to create an abusive work environment; and (5) the harassment was objectively and subjectively offensive.

<u>Prescott v. Higgins</u>, 538 F.3d 32, 42 (1st Cir. 2008) (citing <u>Douglas</u>, 474 F.3d at 15). As the court of appeals has further explained:

> A hostile work environment generally is not created by a "mere offensive utterance," <u>Harris</u>, 510 U.S. at 23; nor does it arise from "simple teasing, offhand comments, and isolated incidents." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998). Courts are supposed to use "[c]ommon sense, and an appropriate sensitivity to social context," to distinguish between such innocuous behavior and severely hostile or abusive conduct. <u>Oncale v. Sundowner Offshore Serv., Inc.</u>, 523 U.S. 75, 82 (1998).

<u>Kosereis</u>, 331 F.3d at 216 (parallel citations omitted).

As with her other claims, Lara has produced no relevant evidence, much less evidence sufficient to establish a prima facie case. Thus, the Department is entitled to judgment as a matter of law on Lara's hostile-work-environment claim.

Moreover, even if all of Lara's allegations were fully supported by a proper evidentiary showing, they still would not support a hostile-work-environment claim.  The only comments Lara alleges that had anything to do with her Hispanic heritage were related to her accent, and the difficulties that some co-workers had in understanding it.[9]  But, as noted above, Lara herself concedes that it was, in fact, difficult for those unaccustomed to speaking with her to understand her accent.  Thus, comments about her accent hardly count as incidents of gratuitous racially oriented ridicule or harassment.  Apart from comments about her accent, Lara identifies no other way in which her race, ethnicity, or national origin were ever acknowledged by any of her co-workers or superiors.  Accordingly, even if the court were to treat Lara's unsworn allegations as properly supported facts, those facts demonstrate neither racially based animus nor harassment that was severe or objectively offensive.  That is,

---

[9] In her summary judgment motion, Lara says: "Stacy Colby the Executive Secretary stated from her desk that my accent was 'hard' " and that "it could not be understood. . . . She informed me that some officers could not understand when I spoke through the equipment [i.e., a walkie-talkie]."  (Def.'s Mot. Summ. J., at 3.)  In response to the Department's request to "[i]dentify any comments made by the Executive Secretary . . . that you claim were racial or ethnically related," Lara reported: "for example I was speaking with JPPO Jason Ellis [and] she stated that 'you need to speak slow to her because she was not native speaking and English is her second language.' "  (Def.'s Mot. Summ. J., Ex. H.)  Lara further responded: "[Colby] also stated in front of Frank Nugent, [that] some JPPOs could not understand my 'hard accent.' " (Id.)

even if Lara had produced evidence establishing the facts relied upon, the Department would still be entitled to judgment as a matter of law on Lara's hostile-work-environment claim.  There was apparently some degree of tension, even hostility, in Lara's workplace, principally between Lara and Colby.  But, without exception, the evidence in the summary judgment record shows that the hostility between Lara and Colby was the result of a mutual personality conflict, not race-based antipathy on Colby's part directed toward Lara.

### Conclusion

For the reasons given, the Department's motion for summary judgment (document no. 14) is granted, and Lara's motion for summary judgment (document no. 16) is denied.  The clerk of the court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

March 5, 2010

cc:  Jannery A. Lara, pro se
     Nancy J. Smith